THE EMPLOYÈR'S LIABILITY ASSURANCE CORPORATION, LTD. *v.* MID-STATE HOMES, INC., AND ETHEENE PETERSON

5-5588                                     467 S. W. 2d 386

Opinion delivered May 24, 1971
[Rehearing denied June 21, 1971.]

790

*Tackett, Young, Patton & Harrelson,* for appellant.

*Robinson & Robinson,* for appellees.

J. FRED JONES, Justice. Mid-State Homes, Inc. filed suit against Etheene Peterson in the Lafayette County Chancery Court to foreclose a mortgage on a house previously damaged by fire. The Employer's Liability Assurance Corporation, Ltd. intervened and paid $2,-647.04 into the registry of the court as the total amount it owed under a fire insurance policy issued to Etheene Peterson.

This is an appeal by The Employer's Liability Assurance Corporation, Ltd., hereinafter called "Employer's", from a decree in favor of Etheene Peterson for the amount of $7,100 plus statutory penalties and attorney's fee. On appeal to this court Employer's has designated the following point on which it relies for reversal:

"The court erred in allowing, over appellant's continuous objection, testimony regarding total loss, the testimony relating to whether or not the insured premises was a total loss at the time of the trial, rather than immediately following the fire."

The facts, as near as we can determine from the record, appear as follows: Etheene Peterson owned a lot in the town of Lewisville in Lafayette County, Arkan-

sas, and contracted with the Jim Walter Corporation to construct a residential building on the lot. She paid $500 down on the building and on March 2, 1962, she executed her promissory note secured by a mortgage to Jim Walter Corporation in the amount of $7,027.20, payable in 144 monthly installments of $48.80 each, commencing on May 5, 1962. Of this amount $4,095 represented principal balance of the purchase price, and $2,932.20 represented interest over the life of the note. The house was completed within about two or three weeks and Miss Peterson started renting it to her sister for $40 per month. On March 12, 1962, the note and mortgage were assigned to Mid-State Homes, Inc.

On March 30, 1965, Employer's insured the property against loss by fire under a policy in the face amount of $7,100, with Etheene Peterson as the primary beneficiary and with a loss payable clause in favor of Mid-State Homes, Inc. or its assignee, as their interest might appear. The record is not clear as to insurance on the property prior to 1965 but it appears that there was additional insurance not germane to the issues in this case.

Etheene Peterson collected the rents from her sister and made the regular monthly payments on the mortgage indebtedness until the house was severely damaged by fire on April 6, 1966. All payments were made to Mid-State through June, 1966, but no payments were made on the note after that date. On July 12, 1967, Etheene Peterson signed a proof of loss directed to Employer's setting out that the actual cash value of the property at the time of the loss was $7,100; that the whole loss and damage amounted to $3,392.68, and that the amount of the claim (apparently because of other insurance) was $2,647.04.

The record is very vague as to the cause for the delays in the collection and payment of the insurance which is the primary subject of this litigation, but it would appear from the overall record that negotiations were going on between Mid-State Homes, Inc. and Jim Walter Corporation on the one side, and Employer's on

the other side, and that Etheene Peterson knew very little about what was going on between the companies. The record indicates that $1,000 or $2,000 in insurance was paid on the fire loss by a company not involved in this litigation, but the record is not clear as to whom the amount was paid, or whether any of it was credited on the note. In any event, according to computation of balance due, filed as exhibit by Mid-State Homes, Inc., Miss Peterson had paid $2,342.40 on the mortgage indebtedness as of July 5, 1966, and still owed as of February 17, 1969, accrued payments in the amount of $1,561.60 and unaccrued principal in the amount of $3,123.20, all of which, together with an insurance premium advanced by Mid-State on July 5, 1965, amounted to a total balance of $4,214.63.

The record indicates that sometime after July 12, 1967, when the proof of loss was signed by Miss Peterson, Employer's sent its draft in the amount of $2,647.04 to the attorney for Mid-State Homes, Inc. By letter dated September 8, 1967, the draft was returned to Employer's with demand for additional amount, two paragraphs of the letter being as follows:

> "Even though the house was covered by more than one (1) policy, under the Mann case, 196 F. Supp. 604, where a home was covered by two (2) policies, the Court in construing the statute found that the total recoverable is the aggregate of the face value of both policies.

> We therefore request that you forward your check for $3,606.87, representing the amount of the mortgagee's interest in the property, to us as attorneys for Mid-State Homes, Inc., the mortgagee of the property."[1]

In any event, Employer's refused to pay any additional amount above the $2,647.04 indicated in the original proof of loss, and this was the amount they subsequently paid into the registry of the court.

---

[1]This letter would indicate that the proceeds of other insurance were credited to the mortgage indebtedness.

On October 23, 1967, Mid-State Homes, Inc. filed its suit against Etheene Peterson for the amount of $4,006.87 it alleged was due and owing on the aforesaid note and prayed a foreclosure of the mortgage against the property. On November 10, 1967, Etheene Peterson filed her answer admitting nonpayment as alleged and setting up usury as a defense. On December 7, 1967, Employer's filed its intervention setting out its receipt of proof of loss signed on July 12, 1967, and alleging that it stood ready, willing and able to pay according to the proof of loss and it tendered into the registry of the court the sum of $2,647.04. On January 10, 1968, Etheene Peterson filed an answer to the intervention and a cross-complaint against Employer's. She admitted that she signed the proof of loss as alleged by Employer's, but alleged that the actual cash value of the property at the time of the fire was $7,000, and that the total damage because of the fire was $6,000. She alleged that the total amount of insurance in effect on the property was $9,000, $7,000 of which was the obligation of Employer's. She prayed judgment against Employer's for 7/9 of $7,000 or $5,444.44, together with interest, penalties and attorney's fee.

The only testimony offered at the trial was that of Etheene Peterson, Mary Lee Peterson, Casey Jones, Bob Burns, Tom Roberts and Jim Fuller. Etheene Peterson testified that she is unable to read and write except that she is able to sign her name. She testified that she purchased a lot for $550 and had a house erected thereon by Jim Walter Corporation paying $500 down on the house. She testified that the house was completed in two or three weeks and that her sister lived in the house. She testified that the house was damaged by fire on April 6, 1966, and had not been lived in since that date. She admitted the execution of the note and mortgage and that she made no further payments after the one she made in June, 1966. She testified that she reported the fire to the "Jim Walter people" the next morning after the fire occurred, and that some of the "Jim Walter people" came out from Texarkana in about a month. She says that some insurance adjusters came to see her about three months after the fire. She says

that the "Jim Walter people" made several trips and that men she thought to be insurance adjusters came with them. This witness testified that she assumed that she had insurance on the property because she was paying premiums along with her regular monthly payments. She says that the "Jim Walter people" finally insisted that she pay up the arrears on her note and that if she did not do so, "they would foreclose me out if I don't pay up." This witness then testified on direct examination as follows:

"Q. Did you understand about the foreclosure?

A. I reckon they meant they wouldn't pay me anything. I thought they would pay off if I would send in the payments but I didn't have anything to pay.

Q. The insurance company hadn't paid you anything and you had no money to pay Mid-State Homes, is that correct?

A. Yes sir, that's right.

Q. When you sent this paper off, when if ever have you been advised or offered any money?

A. They never have offered me any money.

Q. I want you to be clear on this. The Employer's Liability Assurance Corporation was carrying your insurance. After you signed the Proof Of Loss there, when if ever have you been tendered any money on that?

A. I never have been.

Q. When is the first time that you know they had deposited some money in the Court here.

A. I never have known.

Q. Do you remember when I talked with you? They served papers on you when they filed the

foreclosure suit. The Sheriff served papers on you and you brought that to me and you don't know what happened since then in the proceedings in Court?

A. No sir, I don't know.

Q. How far did you go in school, Etheene?

A. Fourth grade.

Q. Can you read and write?

A. No sir.

Q. Can you sign your name?

A. Yes sir, I can sign my name."

On cross-examination this witness testified that she signed the proof of loss in her attorney's office and that it was witnessed by her attorney. She says that she did not know how much she owed on her home at the time of the fire, and that she does not know how much longer she would be required to pay on her house before it was paid out. Under questioning by the attorney for Employer's, this witness testified as follows:

"Q. Did you ever talk to Mr. Robinson about this fire loss?

A. Yes sir, I talked to him about it.

Q. After the fire, did you ever have anyone to go look at the house to deterimine how badly it was damaged?

A. Yes sir.

Q. Did you hire him yourself?

A. No sir.

Q. You never did hire anyone to go down and determine the damage?

A. No sir, but you asked someone else to come.

Q. Did you know how much you owed Mid-State Homes when this fire occurred?

A. No sir.

Q. Did you have a payment book?

A. No sir, I had some cards and I mailed them in.

Q. And you didn't know how much you owed on the house when the fire took place?

A. No sir.

Q. Did you know how much longer it was to go, before the house was paid for?

A. No sir.

Q. You are claiming you signed this piece of paper because they threatened to foreclose your mortgage, is that right?

A. Yes sir.

Q. On your Insurance Policy, do you know first whether or not you had any fire insurance?

A. When I signed it, it was supposed to be so much insurance on it.

Q. And you were to pay so much by the month, is that right?

A. He said it was included in my payments.

Q. So you assumed you had fire insurance on this house, didn't you?

A. Yes sir.

Q. Did you know the company that held the mortgage on your house, Mid-State, was also on the Policy?

A. I didn't know who was on there.

Q. Do you know on the policy that any loss was to be sent or mailed to the person on the mortgage?

A. No sir.

          *   *   *

Q. This paper you signed was signed in your attorney's office, isn't that correct?

A. Yes sir.

Q. Did you talk to Mr. Robinson about it, or to Miss Patsy Robinson?

A. Yes sir, I talked to them about the fire.

Q. You did sign the Proof Of Loss in their office, did you not?

A. Yes sir, I signed it.

Q. You are claiming the only reason you signed it is that you were afraid they would foreclose, is that correct?

A. Yes sir."

Mary Lee Peterson only testified that she lived in her sister's house and paid $40 per month rent; that she lived there until the fire on April 6, 1966.

Casey Jones testified that he is 50 years of age and in the construction and builder's supply business in

Lewisville; that he has been engaged in the construction business for 31 years. He testified that he looked at the property involved on three different occasions. The first time being 1967, the second time being October, 1968, and then again a few days before the trial. He testified that a new house could be built on the lot cheaper than the damaged one could be repaired, and that he would consider the house a total loss. He testified that the first time he looked at the house it would have cost $5,300 to repair it.

On cross-examination this witness testified that the first time he looked at the house was in August, 1967, over a year after the fire had occurred. He testified that the windows were out and that rain had blown in during the intervening time and that there was some apparent water damage which occurred in putting out the fire. He testified, however, that while the roof looked good from outside, it was charred on the inside and the shingles were brittle. This witness then testified as follows:

"Q. If the house had been repaired shortly after the fire, it could have been done for somewhat less than $5,300.00. Isn't that true?

A. Very little less.

Q. Had building costs gone up in 1967, Mr. Jones?

A. Yes, building costs go up every year. It goes up about fifteen percent.

Q. Would that have knocked fifteen percent off the cost, if the house had been repaired right after the fire?

A. Yes, about that."

Bob Burns testified that he is captain of the local fire department and is also in the business of remodeling and building homes. He testified that he saw the build-

ing involved in this case the morning after the fire; that he had inspected the house during the year prior to trial and that in his opinion at that time, the house was a total loss. On cross-examination this witness testified that he thought the house could have been repaired the morning after the fire but that he does not think it could be now.

Tom Roberts, a building contractor, testified that he looked at the house two different times within the past week and that in his opinion the house is a total loss.

Jim Fuller testified that he is connected with "Homestead Homes, Inc." and that his company constructs, builds, sells and assigns new residences in Arkansas, Louisiana and Texas, and that the homes he deals in are very similar to the Jim Walter homes. He testified that he inspected the damaged property about two or three weeks after the fire and again four days prior to the date of trial. He testified that he first looked at the house in early May, 1966, and made a thorough inspection of it as his company was involved in a comparable lawsuit at that time. He testified that at that time, it was his opinion the house could have been repaired for between $2,500 and $3,000.

On recross-examination this witness testified that he spent about 15 minutes examining the house and did not make an itemized list of the necessary repairs.

The chancellor found that on the 6th day of April, 1966, the home located on the property involved was destroyed by fire to such extent that no part of the house was capable of being utilized in restoring the building to the condition to which it was before the fire and therefore was a total loss; that there is due Mid-State Homes, Inc. the sum of $4,339.50, together with an attorney's fee of 10% on the past due note owed by Etheene Peterson. The chancellor awarded judgment for Mid-State Homes, Inc. against the defendant, Etheene Peterson, and Employer's in the amount of $4,773.45, together with interest from date with all cost in the

action to be paid by Employer's. The chancellor decreed a foreclosure of the mortgage on the property involved and ordered sale thereof if the judgment be not paid within 60 days. The chancellor further decreed judgment for Etheene Peterson against Employer's in the amount of $7,100 plus 12% statutory penalties in the amount of $852, together with attorney's fee in the amount of $1,000, to bear interest at the legal rate until paid, with a proviso that the $4,773.45 should first be paid by the insurance company to Mid-State Homes, Inc. with balance together with penalties and attorney's fee to Etheene Peterson.

On trial de novo we are of the opinion that the chancellor's findings and decree are against the preponderance of the evidence. Proofs of loss are primarily intended for securing an adjustment between the insured and the insurer, and the statements contained in a proof of loss as to the amount and circumstances of the loss do not, as a matter of law, preclude the insured from proving and recovering the actual amount of his loss. The proof of loss is merely an estimate of the party, and where a settlement is not made upon it, it is not conclusive of the amount due by the insurance company to the insured, but the insured may recover in a suit upon the policy the amount established by the evidence as the true amount of his loss. *Fidelity-Phenix Fire Ins. Co.* v. *Friedman,* 117 Ark. 71, 174 S. W. 215.

The policy issued by Employer's insured the property against loss by fire "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss." The policy further provided: "This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not." The policy then provided for immediate notice of any loss and provided that the insured protect the property from further damage.

Approximately 15 months elapsed between the date of the fire and the proof of loss. There was an additional delay of approximately 14 months between the date of Employer's intervention and the trial, and there was a total delay of three years four months between the date of the fire and the entry of the decree. The evidence seems clear to us that there was only a partial loss at the time of the fire, but the evidence is equally clear that the loss was total by the time of the trial. It is Employer's contention that it is only liable for damage immediately following the fire, and it is the insured's contention that Employer's is liable for the damage at the time of trial.

In *Connecticut Fire Ins. Co.* v. *Boydston,* 173 Ark. 437, 293 S. W. 730, we stated:

"It is elementary that any competent evidence is admissible to prove the extent or amount of the loss for which the defendant is liable which tends to prove that fact."

We conclude, therefore, that the chancellor did not err in admitting evidence of damage from the date of the fire to the date of the trial. See also *Nat. Union Fire Ins. Co.* v. *Sch. Dist No. 60,* 131 Ark. 547 (at page 554), 199 S. W. 924.

There is no evidence in the record that the insured took any steps whatever to protect the property against additional damage for a period of three years following the fire, and there was ample evidence that additional damage was sustained following the fire. We conclude, therefore, that Employer's was not liable for the total loss of the building at the time of trial, but was only liable, under its contract, for the amount it would cost to repair the building within a reasonable time after the fire as provided in the insurance contract.

Aside from the proof of loss, we only have the testimony of contractor Casey Jones and Jim Fuller as to the cost of repairing the fire damage. Fuller was employed by a competitor of the Jim Walter Corporation

and only looked at the house some 15 minutes because his employer was involved in a similar lawsuit. He testified that the house could have been repaired for $2,500 to $3,000. We are of the opinion, therefore, that the preponderance of the evidence lies in the testimony of Casey Jones. While he saw the house for the first time more than a year after the fire, he estimated that at that time the cost of repair would amount to $5,300, and that it would have cost very near that much to have repaired it immediately following the fire.

It is obvious from the record before us that this house was overinsured; that the named beneficiary in-sureds, Etheene Peterson as well as Mid-State Homes, Inc., were negligent in not reporting and following up on their claim against Employer's, and that Employer's was also negligent in its failure to ascertain the amount of damage to the building and in its handling of the claim even after it had notice of the loss. We conclude, therefore, that the equities are evenly balanced between the parties and that the preponderance of the evidence as to the cost of repairs within a reasonable time follow-ing the damage caused by the fire, rested in the testimony of Casey Jones and that the insureds are only entitled to judgment for his maximum estimate of $5,300. As a matter of fact Etheene Peterson only prayed judgment for $5,444.44, and the chancellor's decree in favor of Mid-State against Etheene Peterson and Employer's in-cluded interest as well as premium advanced on the insurance policy. Etheene Peterson has not appealed from that part of the decree.

This cause is reversed and remanded to the chancery court for the entry of a decree against Employer's in favor of Etheene Peterson and Mid-State Homes, Inc. as their interest may appear, in the total sum of $5,300 without penalty or attorney's fee.

Reversed and remanded.

BYRD, J., would affirm.